Don VESTAL, as President and Business Manager of Local 327 of the International Brotherhood of Teamsters, etc., and Garland Locke and Ed Westherly, members of Local 327 of the International Brotherhood of Teamsters, etc., Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and James R. Hoffa, General President of said International Union, and George J. Abrams, Executive Director of the Honest Ballot Association, Defendants.

Civ. A. No. 4173.

United States District Court
M. D. Tennessee,
Nashville Division.

Sept. 16, 1965.

George E. Barrett, Nashville, Tenn., and James C. Kirby, Chicago, Ill., for plaintiffs.

Cecil Branstetter, Nashville, Tenn., and David Previant, Milwaukee, Wis., for defendants.

WILLIAM E. MILLER, Chief Judge.

Local 327 is a duly chartered and affiliated Local of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Plaintiffs are the President and Business Manager of Local 327, and two members of the Local. Defendants are the International Brotherhood, the General President thereof, and the Executive Director of the Honest Ballot Association.

Local 327 has 5,000 members, 2,100 of whom are employed in the freight industry and will hereafter be referred to as "freighters." The plaintiffs are all non-freighters who sue on behalf of themselves and others in like or similar circumstances.

In March 1965, the General Executive Board of the International Brotherhood received a petition containing 1,500 signatures of members of Local 327 favoring and 500 signatures opposing the issuance of a separate charter to the freighters of Local 327. The Board thereupon directed that a mail referendum be conducted among the freighter members of Local 327. The plaintiffs objected to the use of a mail referendum, and to the fact that only freighters would be permitted to vote.[1] To this latter objection, the General President replied that the Board had authority under the International Constitution to issue a separate charter without any referendum, but the Board felt that it would be "more democratic to let the members involved make the decision on the separate charter for themselves." The General President further stated his interpretation of Article VI, § 1(h) of the International Constitution to be that only the members who would be covered by the separate charter would be eligible to vote on the issue. The Local Union appealed this interpretation to the General Executive Board. The appeal was rejected. The Board specifically: (1) reaffirmed the decision to conduct a mail referendum; (2) reaffirmed the General President's interpretation of the International Constitution that only the freighters would be eligible to vote; (3) ratified all implemental steps taken by the General President; and (4) decided that all other issues raised in the appeal were irrelevant.[2]

On July 26, 1965, the plaintiffs filed suit in this court. Their complaint alleged a violation of the Labor-Management Reporting and Disclosure Act (hereafter referred to as the "Act"), 29 U.S.C.A. §§ 411 and 412, in that the non-freighters would be denied their equal right to vote in the proposed referendum. The complaint asked the court (1) to issue a Temporary Restraining Order to restrain the defendant Abrams from mailing the ballots to the freighters; and (2) to hold a hearing on the issues and to enjoin the defendants from conducting the proposed referendum. That same day, at 8:30 p. m., the court directed the clerk to issue an *ex parte* restraining order, and set August 4, 1965 for a hearing on plaintiffs' application for injunctive relief. At 11:17 p. m. that night, a copy of the restraining order was served on defendant

1. Exhibit C–7 to the plaintiffs' complaint is a letter directed to the General President which points out that on two previous occasions the Board called for a referendum on the issuance of a separate charter for the freighters. On each occasion the Board permitted the *entire* membership to vote, and the charter proposal was voted down. Apparently, the plaintiffs feel the defendants should be estopped from conducting a limited referendum. This position was not urged before the court, and has not been considered, but the Board's previous actions are entitled to some consideration with respect to the proper interpretation of the International Constitution.

2. The court has assumed, for purposes of this opinion, that the plaintiffs' appeal to the Board constituted an exhaustion of internal union remedies. This is not questioned by the defendants.

Abrams, who informed the Marshal that he had anticipated the order and had already mailed the ballots.

Accordingly, on August 4, 1965, the plaintiffs filed an amended complaint which recited the above facts and which asked the court (1) to seize and impound all ballots which were in, or which would come into, the possession of defendant Abrams or the Postal Authorities; and (2) to enjoin the defendants from conducting the referendum and from taking any action as a result thereof.

On August 6, 1965, after a full hearing, the court denied plaintiffs' application for injunctive relief. The court's order, however, expressly reserved all questions and issues for determination should the majority of the freighters vote for a separate charter. The order also enjoined the defendants from taking any steps to implement or certify the results of the referendum, and specifically enjoined the issuance of a separate charter.

Subsequent to this order, the referendum was held. Nine hundred ninety-six (996) freighters out of the 1467 voting (and the 2,100 eligible to vote) favored the issuance of a separate charter. Three hundred ninety-three (393) freighters were opposed. The remaining ballots were, for acceptable reasons, not counted.[3]

On August 27, 1965, the defendants filed a motion to dismiss the injunction issued on August 6, and to dismiss the original complaint. A hearing was held on this motion on September 3, 1965.

Before reaching the merits of this case, it is necessary to consider defendants' motion to dismiss for want of proper venue. Title 29 U.S.C.A. § 412 provides that venue in this type of case shall be found "in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located." The principal offices of the International Brotherhood are located in Detroit, Michigan, and Washington, D. C. Consequently, venue is proper only if the alleged violation occurred in this district. This, in turn, depends on what the alleged violation is. Defendants admit that if the alleged violation is the conducting of a limited referendum, then venue would be proper. Defendants contend, however, that the principal violation which the plaintiffs allege is the improper interpretation of the International Constitution, and that since the interpretation did not occur in this district, there is no venue. The court disagrees with the defendants' definition of the alleged violation. But even if we assume that defendants' definition is correct, their motion to dismiss is without merit. Constitutions are not interpreted in a vacuum. The General President's interpretation of the International Constitution is challenged by the plaintiffs only because of its direct effect upon the plaintiffs' actions in this district. To say that the "interpretation" of the Constitution did not occur in this district is to ignore the fact that the interpreted Constitution, as applied, vitally affects the rights, duties and actions of plaintiffs and Local 327.

Defendants rely on Lodge No. 42 v. International Bro. of Boilermakers, 324 F.2d 201 (6th Cir., 1963), cert. denied, 376 U.S. 913, 84 S.Ct. 669, 11 L.Ed. 2d 610 (1964), which was tried by Judge Frank Gray, Jr. of this court. In that suit, a District Lodge (located outside this district) requested the International Brotherhood (also located outside this district) to disaffiliate a Local Lodge (located in this district) from International membership. Judge Gray granted de-

---

3. One ballot was cast in blank. 56 ballots with names that did not appear on Local 327's list of freighter members, 11 ballots that were cast in duplicate, and 10 ballots which bore no signature on the return envelope, were not counted. The 996 ballots favoring a separate charter represent a clear majority of the votes cast. They do not represent a majority of the 2,100 freighters eligible to vote. For purposes of this opinion, the court assumes that the remainder of the freighters received ballots and simply decided not to vote.

fendants' motion to dismiss for improper venue and his ruling was affirmed on appeal. We think that decision to be correct, but clearly distinguishable. In that case, the request for disaffiliation was initiated outside this district. In this case, the request for a separate charter was initiated by petitions from within this district. In that case, the Court of Appeals was careful to point out that neither of the defendants was alleged to have done *anything* in this district. In this case, however, the defendant Abrams (alleged to be an agent of the International Brotherhood) has been present in this district actively conducting a referendum. Furthermore, the defendants in that case did not require any action of the plaintiffs. In this case, the defendants have required plaintiff Vestal to compile and submit membership lists to the International, and have requested plaintiff Vestal to cooperate in making arrangements for the referendum. Clearly, the referendum itself, and all significant actions, have taken place in this district. Defendants' motion to dismiss for want of proper venue must therefore be denied. To rule otherwise would require this action to be brought in Detroit or Washington, far removed from the actual scene of controversy.

The defendants have also moved to dismiss for the reason that the complaint fails to state a claim upon which relief can be granted. We turn now to this issue.

The plaintiffs now seek to enjoin the certification of the referendum vote for the reason that non-freighters were denied the equal right to vote. If they *have* such a right, the denial would be a violation of 29 U.S.C.A. § 411(a) (1), and would confer jurisdiction upon this court pursuant to § 412.

Defendants rely upon Article XVII, § 1(b) of the International Constitution as "authority * * * to issue the separate charter without conducting any vote." This section is irrelevant. Since defendants have not attempted to issue a separate charter without holding a vote, the applicability of section 1(b) is not in question. Having chosen to hold a vote, defendants cannot seriously contend that the members of Local 327 do not *now* have a right to vote. Nor can the defendants *arbitrarily* grant the right to vote to some members while withholding the right from others.

It appears, then, that at least some of the members of Local 327 do have a right to vote on the issuance of a separate charter, and that this is a right which is "secured" by § 411 of the Act. We must now determine whether these plaintiffs have such a right, or whether the right may be limited to the freighter members of Local 327.

Plaintiffs contend that once a referendum has been ordered, Art. VI, § 1(h) of the International Constitution gives *all* of the members of the local the right to vote. Defendants invoke the same provision as justification for a vote limited to freighters. Section 1(h) reads as follows:

> The General President shall have the authority at his discretion to direct that a referendum vote or a vote by membership in meeting assembled, be held by the membership of any Local Union or subordinate body on any matter, issue or proposition when, in his opinion, the welfare of the membership, the subordinate body, the Local Union or the International Union will be served thereby.[4]

Whether or not this section authorizes a referendum by the freighters only, is

---

4. Whatever "referendum vote" may mean, it is clear by the use of the disjunctive "or" in the above quoted section, that a referendum vote is different from a "vote by membership in meeting assembled." Therefore, plaintiffs' contention that the voters have the right to vote in the latter manner only, is without merit. Whether or not "referendum vote" includes voting by mail is unclear, but may reasonably be implied.

unclear. We must begin, then, with the defendants' interpretation. This, because Art. VI, § 2(a) of the International Constitution provides:

> The General President shall have authority to interpret the Constitution and laws of the International Union and to decide all questions of law thereunder between meetings of the General Executive Board, * * and shall have authority * * * to settle and determine all grievances and disputes submitted to him by * * * Local Unions, * * * all subject to appeal to the General Executive Board, and, thereafter to the next Convention.

The defendant General President has interpreted Art. VI, § 1(h) to mean that only freighters are eligible to vote on the issuance of a separate charter. His interpretation has been affirmed by the General Executive Board. Consequently, if their interpretation is not unreasonable, this court should not interject an interpretation of its own.[5] We must examine § 1(h) then, only to the extent of determining whether or not the defendants' interpretation is reasonable. The section provides that the vote or referendum must be held "by the membership." Defendants have not expressly insisted that the term "membership" as used in this section refers to anything other than the entire membership of a local union. Nor does the court find any basis for a different interpretation in the language of the section or in other provisions of the International Constitution. Consequently, if defendants' interpretation of the section is correct, it must be because of the language which provides for a vote "by the membership of any * * * subordinate body."

■ Although not expressly urged in argument, defendants' position would necessarily depend on the assumption that the freighters of Local 327 constitute a "subordinate body" within the meaning of § 1(h). If we confine our attention solely to § 1(h), this position is at least arguably reasonable. But if we refer to the use of the words "subordinate body" as they are used throughout the International Constitution, it becomes apparent that "subordinate body" does not refer to an informal group within a chartered body. Rather, the words uniformly refer to a formally chartered body *directly* subordinate to the International Union, such as a Joint Council or a Conference. There are, for example, numerous provisions in the International Constitution setting out the form of the Charter for subordinate bodies, and defining the Board's power to revoke or suspend the Charters of subordinate bodies. See Art. VII, § 3; Art. VI, § 2(b); and Art. X, §§ 13 and 14. Of course, it has not even been suggested that the freighters are a chartered body. There are, in addition, numerous provisions relating to the election, bonding, terms of office, and duties of the officers of subordinate bodies. See Art. II, § 4(a) (4) (f); Art. X, § 7(a); Art. VI, §§ 5(a), and (f); and Art. VII, § 4(b). It is clear that these provisions are not applicable to the freighters. Furthermore, there are provisions dealing with the per capita taxes due to subordinate bodies *from* Local Unions, and fees due to the International Union from the subordinate bodies. See Art. X, §§ 4, 12, and 15; and Art. XV, § 3. No such special taxes or fees are due either from or to the freighters. There are also numerous provisions dealing with the assets of subordinate bodies, including books, property, and funds, and giving subordinate bodies the power to deposit, invest, or borrow money. See Art. VI, §§ 5(c) and 5(e); Art. VII, § 2(c); Art. VII, § 6(a); Art. X, § 9; and Art. XIX, § 8.

5. This is the position taken by the defendants in their brief. See Simpson v. Grand International Brotherhood of Locomotive Engineers, 83 W.Va. 355, 98 S.E. 580, cert. denied, 250 U.S. 644, 39 S.Ct. 494, 63 L.Ed. 1186 (1919); Green v. Obergfell, 73 App.D.C. 298, 121 F.2d 46 (1941); Callahan v. Order of Railroad Conductors, 169 Wis. 43, 171 N.W. 653 (1919); and the cases cited in 21 A.L.R.2d 1397, 1413–15.

Similarly, there are provisions dealing with audits of the assets of subordinate bodies—Art. VII, § 7(b); and Art. X, § 10—, with the procedure for merging subordinate bodies—Art. IX, § 11—, the adjustment of claims against subordinate bodies—Art. VI, § 5(e)—, and the procedure for trials and appeals involving subordinate bodies—Art. XIX, § 3(a), (b), and (c). Thus, it would appear from an examination of the International Constitution in its entirety that the freighters of Local 327 are not a "subordinate body," as that term is used in § 1(h). This being so, and there being no other Constitutional authorization, the defendant General President does not have discretion to order a referendum by less than the entire membership of the Local Union.

As mentioned above, it may be (but it is not decided) that the Board has authority to issue a separate charter without conducting any referendum to any group of members of any existing local union. But the Board cannot choose to submit the issue to a referendum and limit the right to vote in the referendum to a particular class of members. Such a limitation, since unauthorized by the union's constitution or bylaws, constitutes a clear violation of 29 U.S.C.A. § 411(a) (1) which provides, in part:

> EQUAL RIGHTS.—Every member of a labor organization shall have equal rights and privileges within such organization * * * to vote in elections or referendums of the labor organization, * * * subject to reasonable rules and regulations in such organization's constitution and bylaws.

Since the defendants' interpretation of the International Constitution is clearly unreasonable, we need not consider whether, if the interpretation were reasonable, a constitutional provision authorizing a referendum limited to freighters would be a reasonable rule or regulation.

It could hardly be denied that injury to the plaintiffs in being denied the right to vote in the referendum is irreparable.

The proposal to separate approximately 2,100 members from a local union composed of approximately 5,000 members, vitally affects its structure, its size and strength, and its bargaining power. Injunctive relief, under the circumstances, is the only adequate remedy.

Accordingly, judgment will be entered declaring said referendum null and void, denying the defendants' motion to dismiss for want of proper venue and for failure to state a claim upon which relief may be granted, and enjoining and restraining the defendants, their agents and representatives, from taking any steps or from performing any act to implement or to effectuate the results of said election or referendum, including any certification of the results, or the issuance or granting of a separate charter to the freighter members of Local 327 based upon the results of said election or referendum.