Anthony G. PIGNOTTI, as an individual member of Local #3 Sheet Metal Workers International Association, Plaintiff,

v.

**LOCAL #3 SHEET METAL WORKERS INTERNATIONAL ASSOCIATION** et al., Defendants.

Civ. No. 72-0-132.

United States District Court,
D. Nebraska.

May 31, 1972.

Edward F. Fogarty, Omaha, Neb., for plaintiff.

David D. Weinberg, Omaha, Neb., for defendants (except Contractors Assn.).

Donald W. Fisher, Toledo, Ohio, for defendants, Sheet Metal Workers International Association, Sheet Metal Workers National Pension Fund, Edward J. Carlough, David Todd.

Ronald K. Parsonage, Omaha, Neb., for defendant, Omaha-Council Bluffs Sheet Metal Contractors Association (now SMACNA–Omaha-Council Bluffs, Inc.,

## MEMORANDUM DECISION

DENNEY, District Judge.

This case has been tried to the Court without a jury and the following memorandum shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Since 1966, the Sheet Metal Workers International Association (hereafter the International Union) has promoted a national pension plan for all sheet metal local unions to join. That plan is called the Sheet Metal Workers National Pension Fund (hereafter National Plan).

In the month of July, 1969, Local #3 Sheet Metal Workers International Association (hereafter Local #3), and the Omaha-Council Bluffs Sheet Metal Contractors Association (hereafter Contractors Association) entered into a collective bargaining agreement to expire on May 31, 1972. In that contract, Article VIII provides that:

Section 14. Pension: The Employers agree that upon a thirty (30) day notice by the Sheet Metal Workers Local #3 to deduct specific amount on specific dates from the gross hourly wage rate as requested by the Union and pay said amount to the *sheet Metal Workers Pension Fund*. By the execution of this Agreement, the Employer also agrees to enter into the appropriate Trust Agreement within the time limit specified above necessary for the administration of such fund and to designate the Employer Trustees under such Agreement hereby waiving all notice thereof and ratifying all actions taken or to be taken by

such Trustees within the scope of their authority. (Emphasis added) It was explained to the members and it was the understanding of the members at the time the contract was ratified that the above provision meant that the details of the pension plan would be decided later and that any plan before selection would be put to a vote of the members. The reference to "sheet Metal Workers Pension Fund" did not refer solely to the National Plan.

At Local #3's regular meeting on September 4, 1969, it was voted that a pension committee be elected to examine the various pension plans in which Local #3 could participate. At a subsequent meeting on January 8, 1970, Jim Pignotti, Paul Wild, Bob Holtz and Jim Newburger were elected to the Pension Committee. The Pension Committee met first on February 19, 1970, and discussed various possible plans. It met again on February 24, 1970, and listened to Paul Stuckenschneider, International Organizer from the International Union, on the merits of the National Plan. At the April 16, 1970, meeting, it was resolved to allow all parties an opportunity to present their individual plans before a recommendation was made. Thus, on May 4, 1970, Ken Fridrich, of Bankers Life, presented the latter's pension plan and on May 20, 1970, John Wilson, of the Prudential Insurance Company, presented its plan.

On July 6, 1970, Edward Carlough, General President of the International Union, wrote to Lester Forman, Business Agent of Local #3, regarding recent changes in the National Plan. The changes were discussed at the Pension Committee's meeting of August 3, 1970. At the meeting of August 10, 1970, Don Schinzel, of Commercial Savings and Loan Association, presented its plan.

It was announced via the Local #3 monthly newsletter that there would be a special meeting on October 22, 1970, to vote on the "pension plan best for Local #3 and the amount of contribution to be submitted and the commencement date". On October 9, 1970, Stuckenschneider wrote to Forman that he would be at the October 22, 1970, meeting to explain the National Plan. At the meeting of October 22, 1970, the members voted not to vote on a pension plan until all members had seen all the plans available. On October 27, 1970, Stuckenschneider wrote again to Forman, this time asking for copies of any other plan presented to the members, that he could compare it with the National Plan. On December 18, 1970, the Pension Committee met again. Stuckenschneider and Dick Reznek from the International Union represented the National Plan and interrogated the Equitable representatives as to the merits of their plan. On December 30, 1970, Stuckenschneider wrote to Jim Pignotti, criticizing and evaluating the Equitable Plan. The Equitable Plan was again discussed at the regular meeting of Local #3 on January 7, 1971. Sometime in January of 1971, the various members of the Pension Committee drafted letters to the general membership regarding their individual recommendations on the pension plan question. All of the letters except that of Jim Pignotti were sent out to the membership. Jim Pignotti's letter was instead read to the membership at a subsequent regular meeting. Walter Brader's letter criticized the Equitable Plan. The letter of Bob Holtz recommended the National Plan. James Newburger's letter stated that he did not feel a local plan was advisable. Jim Pignotti recommended that no plan be adopted at that time. On January 24, 1971, Stuckenschneider wrote to Holtz regarding the earnings of the National Plan. Then, shortly thereafter, Lester Forman, the Business Agent and not a member of the Pension Committee, using apparently the same facilities Local #3 used to publish the monthly newsletter, sent a letter to the members promoting the National Plan and entreating the members not to forget the special pension meeting on March 25, 1971. The monthly newsletter of Local #3 announced the special meeting for March

25, 1971, as the "purpose of this meeting will be to vote for or against a pension plan if accepted the amount of money to be contributed and the month contributions will begin." At the March 25, 1971, meeting, Forman made a motion that the National Plan be adopted starting June 1, 1971. The membership defeated the National Plan by a vote of 93–66.

At the next regular meeting on April 1, 1971, there was again a motion to have at the next regular meeting, as a special order of business, a vote on the pension plan but, if favorable, to table the amount of money until it could be determined what an expected raise in pay for the members would total.

At this point, it should be noted that the Union's Constitution and Ritual provides in Article Ten (10), Section 6—Meetings:

Sec. 6(a). Each local union shall determine the times and places for the holding of its regular meetings, and determine how many of its members shall constitute a quorum. Special meetings shall be called by the local union president or upon the recommendation of the local Executive Board or upon the request of at least ten (10) members in good standing or ten per cent (10%) of the members in good standing, whichever is the greater. The call for such special meeting shall specify the time, place and purposes thereof, and no subjects other than those specified in the call shall be considered at such meeting.

On April 10, 1971, Brader received a petition by more than ten per cent (10%) of the members to call a special meeting to vote again on the pension plan. There appears to have been no hesitancy in Brader's willingness to honor the petition. However, since the pension plan was already scheduled to be voted upon, Brader saved the petition, instead of indicating that the vote of May 6, 1971, should satisfy the petitioners. At the May 6, 1971, meeting, it was voted 58 to 43 that Local #3 did

not want a pension plan. Later in the meeting, a motion was made, according to the minutes, to "postpone indefinitely the pension plan and reference thereto. (Rule 23)" Rule 23 of the Constitution and Ritual of the Union provides that "[w]hen a question is postponed indefinitely it shall not come up again except by a two-thirds (⅔) vote." The vote was taken and by Brader's count the motion was defeated 29 to 24. Quickly, a division of the house was called which revealed that the true vote was 60 to 30 in favor of postponing the pension plan consideration indefinitely. Brader used the petition he had previously received to call another special meeting for June 2, 1971, to vote again, this time by secret ballot, whether or not to begin contributing 20 cents to the National Plan. Such contributions were to begin on July 2, 1971. In the meantime, Brader frantically sought help from Carlough and received via Lonnie Gaither, assistant to Carlough, the bald conclusion that the motion to divide the house during the May 6, 1971, meeting was out of order. Before the vote could be forced at the May 27, 1971 meeting, a point of order was made that the meeting itself was out of order, since it had been called specially to vote on the pension question and Rule 30 of the Constitution and Ritual controlled. Rule 30 provides that "[w]hen a question has been decided, it can be reconsidered only at the same meeting or on the next regular meeting night." This not being a regular meeting, the question could not be reconsidered. Brader overruled the point of order. The ruling of Brader was challenged by the membership and the challenge was sustained upon vote of the members.

Brader was undaunted by this third defeat of the pension plan within as many months and again besought Carlough to personally intervene, which Carlough did by using his power as General President to call yet another meeting, this time for June 21, 1971, to vote again on the National Plan. At the June 21, 1971 meeting, the secret vote

was 77 for, 71 against and 3 void ballots. Brader, Forman, Carlough and their supporters had finally succeeded in getting a favorable vote to the plan. Brader quickly wrote to Robert Hooker, the Executive Director of the Contractors Association to begin deducting on August 1, 1971, 20 cents per hour and sending it to the National Plan. It is interesting to note that the International's monthly magazine for July showed a map, apparently as of June 15, 1971, listing all locals and their locations that were then participating in the National Plan. Local #3 was listed as participating in the National Plan, although, as of June 15, 1971, the plan had been beaten three times in a row. The International was apparently very confident as to the anticipated outcome of the June 21, 1971, vote.

The members against present implementation of a pension plan were amazed at the vote and decided to attempt to use the special meeting provisions of the Constitution and Ritual that Brader had previously been so eager to allow. On June 23, 1971, several petitions were circulated to obtain the required ten per cent (10%) signatures. Forman was presented with the petition, but he said there weren't enough signatures and rejected it. Sometime in July, 1971, Forman visited Tony Pignotti, Jim Pignotti's brother, and the plaintiff herein at the jobsite where Tony Pignotti was working. Forman told Tony Pignotti to keep his mouth shut, that the International could fine him if it chose.

On July 9, 1971, David Todd, an agent for the International Union who had been investigating and monitoring Local #3's activities, wrote Carlough that the International should take over Local #3 now, ostensibly because Local #3 was not getting enough jobs out in the state.

Finally, on July 15, 1971, with an overwhelming number of signatures having been obtained, Brader accepted the petition, but said it was too late. Conversations with Brader on succeeding nights proved fruitless. On July 26,

1971, with the August 1, 1971, time for beginning deductions rapidly approaching, Jim Pignotti and 113 other members filed suit in this Court to enjoin the deductions and requiring Brader to honor the petition. In that suit, the Court was alleged to have jurisdiction to entertain the suit pursuant to 29 U.S.C. A. § 106, governing employer payments to unions. The Court sustained a motion by defendants to dismiss on grounds of no jurisdiction under that statute.

On August 31, 1971, Brader wired Carlough again, this time informing him about the dismissal of the Court action and asking Carlough what to do about the petition. Carlough wired back on September 1, 1971, that Carlough was declining to decide whether to honor the petition or not, but that Brader should make a decision. Carlough stated that if the members didn't like Brader's decision then they could appeal it, which would be to Carlough himself. Finally, Brader decided to honor the petition and the monthly newsletter announced a special meeting for October 22, 1971, to vote on the pension plan again. On October 18, 1971, Todd received a letter from Carlough to update his reasons for taking over Local #3. At the October 22, 1971 meeting, by far the largest turnout of members of the union, the members voted 175 to 119 not to retain the National Plan.

On October 27, 1971, Brader telegraphed the Contractors Association that a meeting was desired to discuss how to cease the pension plan deductions. However, subsequent actions indicate to the Court that there was never any real desire of the defendants to implement the vote of the members of October 22, 1971, and that the telegram itself was, at best, self-serving. On November 3, 1971, formal charges were filed with the International Union by the Local Executive Board against James Pignotti, alleging that he had violated the International Union's Constitutional provision of "[e]ngaging in any

conduct which is detrimental to the best interests of this association or any subordinate unit thereof or which will bring said union into disrepute." The Executive Board of Local #3 has seven members, of which Brader and Forman are two. The alleged violation occurred when James Pignotti had told a local newsman the results of the October 22, 1971, vote.

Almost a month had passed since the vote, with nothing having been accomplished to implement the vote of October 22, 1971, when, on November 15, 1971, James Pignotti filed formal charges against Forman for refusing to implement the vote and appealed to Carlough to do something about Brader and Forman's refusal to follow the will of the majority of the members. The next day, on November 16, 1971, the Executive Committee of Local #3 voted to send another telegram to the Contractors Association, requesting a meeting, and such telegram was sent on November 17, 1971. In contrast, when the plan passed in June, 1971, there were apparently no similar problems in getting together with the Contractors Association to start the deduction. On November 30, 1971, Edward Fogarty, attorney for plaintiffs, wrote to Carlough that suit was being filed but would be stayed if the necessary acts to terminate the plan were completed by December 15, 1971. On December 1, 1971, the Executive Board met with the Contractors Association. The Contractors reasonably requested (1) that any request to delete the plan be made in writing, and in such a manner that it needed no further ratification of the union; (2) that the Contractors receive a release for any liability on their part; and (3) that the pension plan could not be reinstated during the life of the contract, which was approximately six more months. The monthly newsletter of Local #3 indicated that, although the Executive Board of Local #3 had met with the Contractors Association, they would need a legal opinion before proceeding.

On January 4, 1972, Carlough wrote to Todd and told him to take over the Union as trustee, that the letter was in confirmation of telephone instructions regarding the take-over, and that there would be no expenditure of funds or other official action without Todd's express approval. On January 5, 1972, Carlough wrote to James Pignotti that Carlough wouldn't take any action on the appeal of Pignotti to Carlough of the refusal of Brader and Forman to implement the vote of October 22, 1971, because he would have to pass on the legality of the meeting and the duties of the business agent and this might prejudice charges against the business agent. The news of the take-over was announced to the membership at the January 6, 1972, regular meeting of Local #3. At that meeting, a letter was read from Attorney Fogarty, plaintiff's attorney, that stated that the National Plan required that a member work 1200 hours after adoption of the Plan before he had any vested rights in the Plan. No one on January 6, 1972, had the required 1200 hours, although several members would accumulate the required 1200 hours sometime in late January, 1972. Attorney Fogarty also gave his opinion of the tactics used by the minority to stall the implementation of the October 22, 1971, vote and the lack of legal hurdles in putting it into effect. A letter was also read from Attorney Weinberg, the Union attorney, to the members, to the effect that any official who agreed to deletion of the Plan might violate fiduciary duties to act for the best interests of the people they represent. Todd stated at the meeting that he would let the members do anything they wanted to do about the plan, but when the motion was made to have Attorneys Weinberg and Fogarty get together at Union expense to implement the October 22, 1971, vote, Todd said the Plan was going to be left alone, Todd would be able to negotiate the Plan into the contract coming up in June of 1971, and the members would not be allowed to vote to ratify the contract. In a later meeting with Tony

Pignotti and some of the other members, Todd told Tony Pignotti that he would not take steps to end the Plan.

On January 29, 1972, Jim Pignotti died and this suit was brought by Tony Pignotti, his brother.

On March 23, 1972, the International Union held a hearing on the trusteeship that Carlough had imposed on Local #3. The hearing was held in Washington, D. C., and it affirmed the trusteeship.

The plaintiff alleges that the foregoing facts as found by the Court constitute violations of 29 U.S.C.A. §§ 411(a) (1) and 501.

29 U.S.C.A. § 411(a) (1) provides that:

Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C.A. § 501 provides in part:

(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolution of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any manner connected with his duties and from holding or acquiring any pecuni-

ary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction or in behalf of the organization    .    .    ..

■■    Before moving to the specific violations, the Court finds that it should sustain the motion to dismiss this action as to the Contractors Association. It is clear that neither 29 U.S.C.A. § 411 or § 501 reaches a claim against an employer. Duncan v. Peninsula Shipbuilders Association, 394 F.2d 237 [4th Cir. 1968] and Aho v. Bintz, 290 F.Supp. 577 [D. Minn.1968]. The Court also sustains the motion to dismiss as to the defendant, Sheet Metal Workers National Pension Fund.

Except for Carlough, the trustees of the fund are not before the Court and the trustees are indispensible parties to any direct action against the fund. Warshaw v. Local No. 415, International Ladies' Garment Workers Union, 325 F.2d 143 [5th Cir. 1963].

## § 411 VIOLATIONS

■    The Court finds from the facts set out above that defendants, Carlough, Brader and Forman, early in 1971 set out to obtain the participation of Local #3 in the National Plan, whether the majority of the Union wanted the Plan or not. The repeated votes, especially after the motion to postpone indefinitely, amply demonstrate the single-mindedness of these defendants. The use by Carlough of his power to call the election of June 21, 1971, in the aftermath of the three defeats of the Plan in and of itself violated the members' § 411 rights to an equal right to vote and to have that vote be meaningful. The delay by Brader and Forman in calling the special meeting mandated by the petition of July 15, 1971, denied the plaintiff his § 411 rights to equal rights and

privileges to participate in the meetings of Local #3. The blatant refusal of Brader, Forman and Carlough to implement the vote of October 22, 1971, denied the plaintiff his § 411 right to vote as effectively as if they had stuffed the ballot box itself, which has been held to be a violation of § 411. Beckman v. Local No. 46 International Ass'n. of Bridge, Structural and Ornamental Iron Workers, 314 F.2d 848 [7th Cir. 1963]. Defendant Carlough specifically violated § 411 when he took over the Union and appointed trustee Todd. The Court is convinced that the purpose of the trusteeship was to prevent any further action of the members toward implementing the vote to discontinue the Plan. In these circumstances, abolishment of the right to vote via a trusteeship amounts to a denial of the § 411 right to vote and cannot be said to be a reasonable rule or restriction on that right. This trusteeship is akin to a classification of all members as associates or second class members. Such as been held to be an unequal application of the right to vote and violative of § 411. O'Brien v. Paddock, 246 F.Supp. 809 [S.D.N.Y.1965]. *See also* Vestal v. International Brotherhood of Teamsters, 245 F.Supp. 623 [M.D.Tenn.1965]. Finally, defendant Todd's refusal to implement the vote of October 22, 1971, and his intentions to seal the tomb on the controversy by negotiating it into the future contract and then not to allow the members to ratify it constitutes a violation of § 411. The power of office in the Union cannot be used to adopt rules the effect of which is to deny the members the right to an equal vote. Libutti v. DiBrizzi, 337 F. 2d 216 [2nd Cir. 1964]. Although Todd might, as a trustee, prevent future meetings and votes, nowhere has it been held that the trustee can upset the results of meetings and votes occurring prior to the imposition of the trusteeship. The International Union will be bound by the acts of its agents, Carlough and Todd. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. United States, 275 F.2d 610 [4th Cir. 1960].

## § 501 VIOLATIONS

This Court is guided by the opinion of Judge Larson in Nelson v. Johnson, 212 F.Supp. 233 [D.Minn.1963], and of the Eighth Circuit in that case on appeal, Johnson v. Nelson, 325 F.2d 646 [8th Cir. 1963] as to what constitutes violations of § 501. "§ 501 imposes fiduciary responsibility in its broadest application and is not confined in its scope to union officials only in their handling of money and property affairs." Johnson v. Nelson, supra, at p. 651.

It is clear to the Court that all of the defendants have breached their fiduciary duties in allowing their personal feelings to interfere with their duties as officers. Defendants Brader and Forman early demonstrated their allegiance to the National Plan. Brader by the use of his position as President repeatedly called meetings and then prevailed upon Carlough to call another meeting to secure an affirmative vote of the members. Forman went so far as to use the facilities of Local #3 to publish and influence the views of the members. Then, having finally achieved an affirmative vote, Brader and Forman delayed any other vote. Unable to delay any longer, they did the next best thing and refused to implement the vote of October 22, 1971, against the National Plan.

Counsel for the defendants has argued that the Court should take no action because there are members who now, because of the delay, have vested rights under the Plan. It was no doubt the idea of the defendants that, if they delayed, the Court would be unable, vesting having occurred, to unscramble the situation, and negotiating the Plan into the new contract would finish off the plaintiff.

The Court is not unmindful of the position of those members who may have

vested rights under the Plan, but it is confident that they will be able to seek separate redress against the defendants who have caused their plight, should they be so inclined. It is not the plaintiff who should be prejudiced by the tardiness and breach of their fiduciary duties by the defendants.

Defendant Carlough breached his § 501 trust when he joined or led Brader and Forman in their efforts. His calling of the June 21, 1971 meeting, in light of the past defeats of the National Plan and the motion to postpone indefinitely, and finally taking over the Union itself amount to total disregard of his § 501 trust. Defendant Todd, as trustee, breached his own § 501 trust duties when he refused to allow the vote of October 22, 1971, to be implemented and supplemented it with an intent to negotiate the Plan into the new contract and not allow the members to ratify the new contract. The International Union will be bound by the acts of its agents, Carlough and Todd. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. United States, supra. Like Johnson v. Nelson, supra, this Court concludes that actions by the officers to refuse to implement a vote of the majority violates § 501 and cannot be allowed to pass without relief. "*If* there have been some labor union officials who have thought that they could flaunt the rights of the union member with immunity from the courts, they should be thoroughly disabused of the notion. . . . This Court sees no reason to leave the slightest doubt in the mind of the autocratic union official that the will of Congress [in enacting § 501] is going to be strictly enforced." Nelson v. Johnson, supra, 212 F.Supp. at p. 273.

## RELIEF

29 U.S.C.A. § 412 provides that for violations of § 411 the Court may give "such relief (including injunctions) as may be appropriate."

29 U.S.C.A. § 501(b) provides that the member may recover "damages or secure an accounting or other appropriate relief for the benefit of the labor organization."

It has been held that the injunction under § 411 can be mandatory in form, Magelssen v. Local Union No. 518, Operative Plasterers, 240 F.Supp. 259 [W.D. Mo.1965]. In that case, the Court ordered the local which had wrongfully transferred a member's dues book to the international union to exercise its best efforts to secure the return of the book. An award of $500 to each union member who was improperly disciplined by the union was held not to be excessive relief under § 411 in Local Lodge No. 455, Int. Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO v. Terry, 398 F.2d 491 [5th Cir. 1968]. In Nelson v. Johnson, supra, the remedy fashioned pursuant to § 501 was to require the officials of the union to implement the vote of the majority of the members, which they had been refusing to do.

Here, the Court, in accordance with the principles of the foregoing decisions, will grant the following relief for the proven violations of §§ 411 and 501 by the defendants:

1. The defendant, Omaha-Council Bluffs Sheet Metal Contractors Association will be dismissed as a party defendant.

2. The defendant, Sheet Metal Workers National Pension Fund, will be dismissed as a party defendant.

3. The defendants will be jointly and severally liable for damages in an amount equal to the amount of money that has been deducted from the wages of the members of Local #3 since August 2, 1971, and paid to the Sheet

Metal Workers National Pension Fund. This amount should be calculated as of a date not to exceed 30 days from the date of this decision, as agreed upon by the parties and submitted to the Court for approval. If the defendants can legally obtain back from the Sheet Metal Workers National Pension Fund the amount of this judgment, it may be used to satisfy this portion of the judgment. The funds will be paid into an escrow account in the local bank used by Local #3. Following the negotiation of the new contract, if the parties can agree to a final vote to be binding for the duration of the new contract on the pension plan controversy, then the funds are to be held in the escrow account pending the outcome of the vote. If then the vote is for participation in a pension plan, the funds are to be paid from the escrow account to the particular plan chosen. If no agreement can be reached as to having a vote or the vote that is held is against any plan, then the funds are to be returned pro rata to the members of Local #3, from whose paychecks the funds were deducted, whether or not they are presently members of Local #3.

4. The defendants will be enjoined from further delaying the implementation of the October 22, 1971, vote and will be required to cease within thirty (30) days all participation on the part of the members of Local #3 in the Sheet Metal Workers National Pension Fund. This particular date should also be agreed upon by the parties and submitted along with the judgment amount as above ordered.

5. To insure that this decision is not futile, the defendants will be enjoined from negotiating into the new contract any pension provision more binding on Local #3 or its members than the present contractual provisions. In addition, the defendants will be enjoined from taking any action to dissolve Local #3, in order to assign its members to other Locals that do participate in the National Plan.