AMERICAN POSTAL WORKERS UN-ION, AFL–CIO, HEADQUARTERS LO-CAL 6885, Earl Jones, President, Burlene Windell, Ronald Bernstein, Sidney Coplon, Lewis Gerlach, E. Victor Hobbs, and Marie Rose, Appellants,

and

Linneaus M. Parker, David C. Drake, Jay D. Fadley, Joseph E. Hannigan, Naguib M. Mikheal, Thomas Norman, and Eugene E. Nowak, Intervenor-Appellants,

v.

AMERICAN POSTAL WORKERS UN-ION, AFL–CIO, Emmet Andrews, President, Richard Wevodau, United States Postal Service, and Edward Ward, Appellees.

Nos. 79–2519, 79–2520.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1980.

Decided Sept. 1, 1981.

---

**33.** Maj.Op. at —— n.41.

Daniel B. Edelman, Washington, D. C., with whom Charles R. Both, Washington, D. C., was on the brief, for appellants.

Daniel B. Jordan, Washington, D. C., with whom Thomas P. Powers and Patrick J. Riley, Washington, D. C., were on the brief, for appellees American Postal Workers Union, AFL–CIO, Emmet Andrews, and Richard Wevodau.

Sherryl A. Cagnoli, Supervisory Atty., U. S. Postal Service, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty. and Stephen E. Alpern, Associate Gen. Counsel, U. S. Postal Service, Washington, D. C., were on the brief, for appellees United States Postal Service and Edward Ward.

Robert F. Gore, Memphis, Tenn., for intervenor-appellants.

Before TAMM and MIKVA, Circuit Judges, and PHILIP NICHOLS, Jr.,* Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion filed by Judge NICHOLS, concurring in part and dissenting in part.

MIKVA, Circuit Judge:

Appellants, a local union and its members, challenge a contract agreed to by their

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

parent union, the American Postal Workers Union, and employer, the United States Postal Service. Seeking injunctive, declaratory, and compensatory relief, appellants argue that the bargaining process leading to the contract was defective in a number of ways and violated their rights under the federal labor laws. They appeal from orders of the district court dismissing the allegations against the Postal Service defendants and granting summary judgment with respect to the claims against the union defendants. We agree with appellants that the union's refusal to submit the collective bargaining agreement to the local for ratification, while giving other union members the right to ratify their contracts, was inconsistent with the equal rights provision of the Labor-Management Reporting and Disclosure Act of 1959, § 101(a)(1), 29 U.S.C. § 411(a)(1) (1976). We therefore find the district court's order of summary judgment on that claim erroneous and reverse for further consideration of the parties' contentions. On all other issues, we affirm.

## I. BACKGROUND

The Postal Reorganization Act of 1970 (PRA), 39 U.S.C. §§ 101–5605 (1976), provided for the first time that postal labor relations were to be similar to those in the private sector and were, to the extent consistent with the PRA, to be subject to the requirements of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169 (1976). *See* 39 U.S.C. § 1209(a) (1976). The American Postal Workers Union (APWU or union) was created in July, 1971, with the merger of four national unions, each representing one craft in the United States Postal Service (USPS or Postal Service). The union conducted collective bargaining negotiations with the Postal Service, which resulted in a "National Agreement" dated July 20, 1971. That agreement was not referred to the union's members for approval because the APWU constitution did not provide for contract ratification by the membership.

At the 1972 APWU convention, however, the constitution was amended by the addition of article XIX, which established certain procedures to be followed in negotiating future contracts. Included in article XIX was a provision requiring "[a]pproval by a majority of the union members voting who are covered by the proposed agreement." Joint Appendix (J.A.) at 128.[1] At that time, the APWU represented only em-

---

1. Article XIX of the APWU constitution provided in full:

SEC. 1. There shall be a National Rank and File Bargaining Advisory Committee to be created immediately upon adoption of this amendment and which shall exist during the life of each national agreement and beyond until the next subsequent agreement is agreed to. Each member of the National Executive Board shall appoint one (1) member who is not on the national payroll to serve on the Rank and File Bargaining Advisory Committee.

The purpose of this committee shall be to recommend and advise the National Negotiating Team on bargaining demands. It shall be convened on the call of the General President not less than sixty (60) days prior to the submission of the proposed contract demands and at such other time(s) as the General President might deem necessary to keep the Committee adequately informed on the progress of the negotiations, but specifically when any tentative agreement has been reached.

SEC. 2. The National Negotiating Team has full authority to negotiate the terms of any collective bargaining agreement with an employer with respect to grievances, labor disputes, rates of pay, wages, fringe benefits, hours of employment or conditions of work, subject to the following:

1. Approval by a majority of the Rank and File Bargaining Advisory Committee voting on such proposed agreement.

2. Approval by a majority of the union members voting who are covered by the proposed agreement.

SEC. 3. The National Rank and File Bargaining Advisory Committee upon their approval of the tentative agreement shall determine the conduct of the membership ratification vote by mail. They shall select from among their members a subcommittee of five (5) to supervise the counting of the ballots. A special fund shall be established by the General Secretary-Treasurer to defray the cost of such referendum by the deduction from the check off dues payable to each local for the month immediately prior to the month in which the existing collective bargaining

ployees governed by the national agreement.

Beginning in 1973, the APWU was selected as the bargaining representative for a number of small, non-mail processing units in the USPS, which are excluded from coverage under the national agreement. Bargaining for employees in those departments was conducted by a union official, with the assistance of a committee of employees from the unit. APWU presidents interpreted article XIX of the union constitution as applying only to national units, and collective bargaining agreements for non-mail processing units were not subject to ratification votes.[2]

Following a representation election, the APWU was certified in November, 1977, as the exclusive bargaining representative for employees in the Postal Service's Research and Development Department in Rockville, Maryland. APWU Local 6885, which represents those employees, and its members are the appellants in this case. Negotiations between the union and the USPS aimed at an initial bargaining agreement began on February 15, 1978. Because the parties were unable to reach a consensus, bargaining was suspended on May 15, 1978. Both sides then began preparing for factfinding, a procedure available under the PRA when ninety days of negotiation have failed to produce a contract and when the parties have been unable to agree on an alternative procedure for resolution of the conflict. *See* 39 U.S.C. § 1207(b), (d) (1976). Under this provision, a three-member factfinding panel conducts an investigation and submits a report on its findings, which may be accompanied by recommendations.[3]

Richard Wevodau, the APWU official assigned to represent Local 6885 at the bargaining table, was skeptical about the usefulness of factfinding and requested another bargaining session prior to factfinding. The USPS agreed, on the condition that only the chief negotiators meet. Those negotiations resulted in a tentative agreement on all issues one day prior to the first scheduled day of factfinding. The contract became effective on July 15, 1978.

Appellants allege that the bargaining procedure was defective in a number of respects. First, they maintain that the APWU[4] breached its promises to the local, and violated article XIX of its constitution and section 101(a)(1) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411(a)(1) (1976), by failing to submit the proposed contract to Local 6885 members for ratification. The local also contends that appellees breached their statutory duty of fair representation, *see* NLRA § 9(a), 29 U.S.C. § 159(a) (1976), and fiduciary duty, *see* LMRDA § 501, 29 U.S.C. § 501 (1976), in several ways: by covertly resuming negotiations without consulting the local; by making concessions on union demands; by breaching promises to suspend bargaining during factfinding; by reneging on a pledge to permit the local's committee to attend bargaining sessions; by executing the contract without complying with appellants' request for a copy; and by failing to submit the proposed agreement to the membership for ratification. Intervenors, nonunion workers in the affected unit, contend further that the union deprived them of their statutory right to

agreement terminates—an amount equal to the cost of the conduct of the referendum among the members of each local. J.A. at 127–28.

**2.** The APWU had been certified to represent approximately six non-mail processing units before the unit represented by Local 6885. *See* J.A. at 118–19 (affidavit of Emmet Andrews, APWU President). Apparently in none of those cases did the affected employees claim the right to ratify their contract. *See id.* at 232–35.

**3.** Parties that do not reach agreement within 180 days of the beginning of negotiations and do not develop an alternate procedure for resolution of the dispute are then subject to binding arbitration. *See* PRA § 1207(d), (c), 39 U.S.C. § 1207(d), (c) (1976).

**4.** Named as defendants in addition to the union were Emmet Andrews, APWU President, and Richard Wevodau, the chief union negotiator responsible for representing appellants at the bargaining table.

factfinding.[5] The court below, by order dated November 26, 1979, dismissed each of these claims on appellees' motion for summary judgment. *See* J.A. at 109.

Alleging that the USPS defendants knew of, and assisted, the union's breach of its duty of fair representation, appellants' complaint also names as defendants the Postal Service and its chief negotiator, Edward Ward. The district court granted the motion to dismiss the claims against these appellees on February 14, 1979. *See* J.A. at 107. Appellants challenge both orders.

## II. THE RIGHT TO RATIFY

### A. *"Equal Rights" Under the APWU Constitution and Section 101(a)(1)*

Appellants insist that, in failing to submit the proposed contract to Local 6885 members for approval, the union acted inconsistently with its constitution and with appellants' entitlement to "equal rights and privileges" under section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1) (1976). With respect to the first argument, appellants maintain that article XIX of the union constitution, *see* note 1 *supra*, must be read to require ratification of any contract, not just of a national agreement. They draw sup-

port from a brochure distributed by the union, *see* J.A. at 154,[6] and from representations allegedly made during the organizational campaign. Appellants also note that the union constitution was amended in 1978 to give non-mail processing units the right of ratification.[7]

Appellees have two responses. First, they argue that the federal courts have no jurisdiction to consider this contention. The relevant statutory provision is section 1208(b) of the PRA, which is similar to section 301(a) of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185(a) (1976), and gives federal courts jurisdiction over "[s]uits for violation of contracts between the Postal Service and a labor organization representing Postal Service employees, or between any such labor organizations." 39 U.S.C. § 1208(b) (1976).[8] The union maintains that its constitution is not a contract under the terms of section 1208(b). The circuits have split on this issue, and this court has once declined to resolve the controversy. *See 1199 DC, National Union of Hospital & Health Care Employees v. National Union of Hospital & Health Care Employees*, 533 F.2d 1205, 1207–08 (D.C.Cir.1976).[9]

---

5. Intervenors also adopt those of appellants' arguments applicable to them. Although non-union members are protected by the duty of fair representation, they obviously may not allege violation of rights under the union constitution or LMRDA § 101(a)(1), 29 U.S.C. § 411(a)(1) (1976). In the interest of simplification, this opinion does not hereafter distinguish between Local 6885 members and nonunion employees represented by the union.

6. The specific language in the brochure to which appellants point provided: "The APWU is a democratic union with a voice and vote for every member, not only in the election of officers, but the APWU *will not validate* any contract it negotiates without *submitting it to you*, in a mailed, secret ballot, for ratification, prior to adoption." J.A. at 155 (emphasis in original).

7. Article XIX was amended by the addition of a new § 4, which provides: "Members who are covered by the terms of a tentative collective bargaining agreement pertaining to a non-mail processing unit shall have the right to ratify such agreement by a method selected by the General President." J.A. at 130.

8. Section 301(a) of the LMRA provides for jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . , or between any such labor organizations." 29 U.S.C. § 185(a) (1976). Both parties agree that the cases analyzing this section are applicable in determining the proper scope of PRA § 1208(b). *See American Postal Workers Union, Tyler, Texas, Local v. United States Postal Service*, 356 F.Supp. 335, 336 (E.D.Tex.1972).

9. The court did hold, however, that even if a union constitution could be considered a contract within the terms of § 301(a), that provision does not confer jurisdiction in a case involving a *strictly intra-union conflict*; some allegation of a threat to industrial peace is necessary. *See 1199 DC, National Union of Hospital & Health Care Employees v. National Union of Hospital & Health Care Employees*, 533 F.2d 1205, 1207–08 (D.C.Cir.1976); *see also Baker v. Newspaper & Graphic Communications Union, Local 6*, 628 F.2d 156, 163–64 (D.C.Cir.1980). For cases from other jurisdictions holding that § 301(a) does encompass

Second, appellees insist that refusing to allow Local 6885 members to ratify the contract was in accord with the union constitution. They dispute appellants' reading of article XIX and point to its plain language, in particular the many references to "national" committees, agreements, etc. Moreover, the APWU observes, that provision has been interpreted by union presidents as applying only to the national agreement. *See J.A.* at 184–86, 230–39.[10] Such interpretations, if reasonable and in good faith, are not to be disturbed by the courts. *See, e.g., Stelling v. International Bhd. of Electrical Workers Local 1547,* 587 F.2d 1379, 1388–89 (9th Cir. 1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979); *English v. Cunningham,* 282 F.2d 848, 850 (D.C.Cir.1960); *Gardner v. Woodcock,* 384 F.Supp. 239, 247 (E.D.Mich.1974). Finally, appellees are critical of the local's reliance on the campaign brochure and representations: they maintain that the brochure is addressed only to APWU members covered by the national agreement and that the local was informed that it had no right to ratify.

We find no need to interpret article XIX of the APWU constitution or to rule on the reasonableness of appellees' construction. Even if appellants have no ratification right under the literal terms of the constitution, they do have such a right under section 101(a)(1) of the LMRDA, which provides in pertinent part:

> Every member of a labor organization shall have equal rights and privileges within such organization . . . to vote in elections or referendums of the labor organization, . . . subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1) (1976).[11]

This provision itself accords no voting rights to a union membership, but it does mandate that rights given to some members be available to all. The Ninth Circuit has described section 101(a)(1) as protecting union members from "denial of a voting right given to any other member or class of members." *Stelling,* 587 F.2d at 1385. *See also Calhoon v. Harvey,* 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964); *Alexander v. International Union of Operating Engineers,* 624 F.2d 1235, 1240 (5th Cir. 1980); *Lux v. Blackman,* 546 F.2d 713, 716 (7th Cir. 1976); *Fritsch v. District Council 9, Bhd. of Painters,* 493 F.2d 1061, 1063 (2d Cir. 1974); *Mori v. International Bhd. of Boilermakers Local 6,* 482 F.Supp. 838, 843 (N.D.Cal.1979).

It is undeniable that appellants have alleged discrimination of precisely the type which section 101(a)(1) addresses.[12] As this court observed in *Bunz v. Moving Picture*

claims under union constitutions, but requiring some significant impact on labor-management relations, see *Alexander v. International Union of Operating Engineers,* 624 F.2d 1235, 1238 (5th Cir. 1980); *Stelling v. International Bhd. of Electrical Workers Local 1547,* 587 F.2d 1379, 1382–84 (9th Cir. 1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979). *But see, e.g., Smith v. United Mine Workers,* 493 F.2d 1241, 1242–44 (10th Cir. 1974) (finding that § 301(a) was not meant to create federal jurisdiction for claims based on union constitutions); *see also Trail v. International Bhd. of Teamsters,* 542 F.2d 961, 966–68 (6th Cir. 1976) (prohibiting individual union members from suing under § 301(a) when claim is based on union constitution).

10. Evidently, however, the interpretation was never memorialized in writing. *See* J.A. at 184, 189 (deposition of Richard Wevodau, chief APWU negotiator); *id.* at 235–36 (deposition of Emmet Andrews, APWU President). In fact, the record does not clearly indicate that any

such prior interpretations actually existed: apparently, the non-mail processing units organized by the APWU prior to Local 6885 never requested the right to ratify, and the question may never have come up. *See id.* at 232–35.

11. Section 102 of the LMRDA, 29 U.S.C. § 412 (1976), permits anyone whose § 101(a)(1) rights have been infringed to bring suit in federal district court.

12. Section 101(a)(1)'s reference to "referendums" indisputably includes ratification votes on collective bargaining agreements such as that at issue here. *See, e.g., Alexander v. International Union of Operating Engineers,* 624 F.2d 1235, 1239 (5th Cir. 1980); *Trail v. International Bhd. of Teamsters,* 542 F.2d 961, 966 (6th Cir. 1976); *Christopher v. Safeway Stores, Inc.,* 476 F.Supp. 950, 954 (E.D.Tex.1979); *Thomas v. United Mine Workers,* 422 F.Supp. 1111, 1117 (D.D.C.1976).

*Machine Operators' Protective Union Local 224*, 567 F.2d 1117, 1121 (D.C.Cir.1977), "[a] union's discrimination against its members is most obvious, of course, when it denies some of them the right to vote outright." The APWU has in effect created two classes of members, only one of which is entitled to ratify its collective bargaining agreements. Such classifications, unless within the scope of the statute's proviso regarding "reasonable rules and regulations," are impermissible under section 101(a)(1): "while a union may set up procedural and even substantive conditions or restrictions on the members' right to vote, it may not do so indefinitely or arbitrarily so as to establish a permanent special class of membership not entitled to an equal vote." *Acevedo v. Bookbinders Local 25*, 196 F.Supp. 308, 311 (S.D.N.Y.1961). *See also Pignotti v. Local 3, Sheet Metal Workers International Ass'n*, 343 F.Supp. 236, 243 (D.Neb.1972), *aff'd*, 477 F.2d 825 (8th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *O'Brien v. Paddock*, 246 F.Supp. 809, 811–12 (S.D.N.Y. 1965).[13]

### B. *"Reasonable Rules and Regulations"*

The APWU's refusal to permit Local 6885 to approve its contract, while requiring ratification votes on the national agreement, is therefore contrary to section 101(a)(1) if it cannot be justified as a "reasonable" distinction. In ruling for appellees on this issue, the court below held:

> Rather than discrimination, such a provision merely enables the unions to deal flexibly in their selection of bargaining methods.

J.A. at 110 (citing *Byrom v. American Postal Workers Union*, Civ. No. 78–4268, slip op.

at 7 (S.D.N.Y. Oct. 2, 1979), *reprinted in* Brief for Appellees APWU, et al., app. at U–33, U–39).

This rationale was more fully explained in *Byrom*, in which the court noted that contract ratification is a method of collective bargaining. The other general method of negotiating contracts—giving the bargaining representative final authority to bind the membership—may be more or less advantageous relative to the ratification method, depending on the circumstances of the particular situation. The court in *Byrom*, followed by the court below, inferred that Congress did not intend by section 101(a)(1) to limit a union's flexibility in selecting bargaining methods.

We are not persuaded that this notion of flexibility rises to the level of a "reasonable" justification for discriminating against non-mail processing units in the exercise of ratification rights. No evidence in the record explains why ratification was inappropriate for the Local 6885 bargaining agreement, or even for nonnational contracts generally. No differences between such contracts and the ratified national agreements were articulated by appellees, by the court below, or by the court in *Byrom*. In fact, there is no indication that the desire to preserve flexibility even motivated the discrimination challenged by appellants. Moreover, accepting this broad, general concept of flexibility as sufficient explanation for the disparate treatment here gives unions carte blanche to discriminate among members and substantially vitiates the force of section 101(a)(1). *Cf. Alvey v. General Electric Co.*, 622 F.2d 1279, 1286 (7th Cir. 1980) (similar reasoning re union's asserted rationale of "uniformity").[14]

---

**13.** When the LMRDA, containing § 101(a)(1), was enacted in 1959, the Operating Engineers union divided members into voting and nonvoting classes. The equal rights mandate of § 101(a)(1) was presumably intended to put an end to that practice. *See* Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich.L.Rev. 819, 833 (1960); Interview with Michael J. Bernstein, counsel to Senate Labor Committee, *reprinted in* 2 National Labor Relations Board, Legislative History of

the Labor-Management Reporting and Disclosure Act of 1959, at 1824 (1959).

**14.** The court in *Byrom* and appellees characterize the distinction between national and nonnational units as reasonable because of the exorbitant cost of convening the 49 members of the National Rank and File Advisory Committee, which is required by article XIX to consider and approve contract proposals, for each tiny nonnational unit. *See Byrom v. American Postal Workers Union*, Civ. No. 78–4268, slip

What does emerge from the record is a mechanical adherence to prior practice with no rational policy justification. When the APWU constitution first provided for member ratification of collective bargaining agreements, the union represented only persons covered by the national contract. There was obviously no need for the framers of article XIX to consider whether a similar procedure should be followed in negotiating contracts for non-mail processing units, and article XIX referred exclusively to "national" agreements, negotiating teams, etc. As the union gradually undertook representation of nonnational units, this language was understandably interpreted to permit ratification only of national agreements. That construction was considered precedent and followed—with no apparent consideration of the reasonableness of the distinction. *See* J.A. at 244 (deposition of Emmet Andrews, APWU President). The traditional interpretation was then "corrected" in 1978 when the union constitution was amended to permit ratification by non-mail processing units. *Id.*

 If our historical analysis is accurate, the union's discrimination against appellants and their kind is not justified by any reasonable distinction between them and those union members given a right of ratification, and article XIX may not be deemed one of the "reasonable rules and regulations" permitted by section 101(a)(1). We therefore find that the district court's order of summary judgment with respect to this issue was error.

Our conclusion is corroborated by interpretations of the statute's reference to "reasonable rules and regulations" appearing in the case law and the legislative history. These sources indicate that a union may limit voting to active members, or to

those in good standing, and may exclude those who have not belonged to the union for the requisite period of time. *See, e.g., Alvey*, 622 F.2d at 1284 (members in good standing); *Thomas v. United Mine Workers*, 422 F.Supp. 1111, 1117 (D.D.C.1976) (dictum) (active members); *Acevedo v. Bookbinders Local 25*, 196 F.Supp. 308, 311 (S.D.N.Y.1961) (dictum) (six-months to one-year membership requirement). *Cf.* 105 Cong.Rec. 15,536 (1959) (remarks of Rep. Thompson) (in favor of permitting unions to exclude inactive and supervisory members from vote).[15]

In addition, section 101(a)(1) permits a union to limit participation in a specific vote to those whose interests are affected. *See, e.g., Alvey*, 622 F.2d at 1286–87; *Fritsch v. District Council 9, Bhd. of Painters*, 493 F.2d 1061, 1063 n.8 (2d Cir. 1974) (no right to vote for other locals' bargaining agents, who performed no duties for appellants); *Williams v. International Typographical Union*, 423 F.2d 1295, 1298 (10th Cir.), *cert. denied*, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970); (those who only moonlight as printers have no "vital interest" in, and therefore no right to vote on, wage scales); *Acevedo*, 196 F.Supp. at 311 (separation of skilled and unskilled workers for purposes of bargaining and representation).[16]

The courts have, however, expressed disapproval of other classifications drawn by a union that operate to deny the right to vote to some members. In *Alvey*, for example, the union constitution permitted only members in good standing—those who had paid dues—to participate in union affairs. Laid-off members of the union were not permitted to pay dues and were therefore excluded from a vote to ratify revised seniority

---

op. at 6 (S.D.N.Y. Oct. 2, 1979), *reprinted in* Brief for Appellees APWU, et al., app. at U–33, U–38. Although this rationale may justify differential treatment of non-mail processing units in that sense, it has no relevance to the discrimination of which appellants complain—the denial of the right to ratify.

**15.** *See also* Cox, *supra* note 13, at 834 (distinguishing between active and retired members).

*Cf.* Hickey, *The Bill of Rights of Union Members*, 48 Geo.L.J. 226, 241–42 (1959) (in favor of permitting unions to exclude inactive members, supervisors, and those who have not been union members for a certain period of time).

**16.** *See also* Cox, *supra* note 13, at 832 (barring members of unaffected units from vote).

rules. The Seventh Circuit found this distinction unreasonable and noted that "discrimination is most invidious where, as here, it is applied to prevent a group of members from voting or even speaking on matters that vitally affect them." 622 F.2d at 1287. *See Trail v. International Bhd. of Teamsters,* 542 F.2d 961, 966 (6th Cir. 1976) (affirming refusal to dismiss section 101(a)(1) claim based on union's affording appellants ratification right only on national and central states agreements and denying vote on Michigan Rider, which also affected them); *Vestal v. International Bhd. of Teamsters,* 245 F.Supp. 623, 628 (M.D. Tenn.1965) (forbidding union from permitting only the freighters in a local to vote whether to issue separate charter to freighters); *Acevedo,* 196 F.Supp. at 312 ("manifestly unreasonable" to deprive unskilled members of right to elect certain union officers, a matter "vitally affect[ing] their material and economic interests").[17]

■ Prior interpretations of the "reasonable rules and regulations" exception to section 101(a)(1)'s equal rights mandate do not support the distinction the APWU has

drawn here. Postal Service employees in Local 6885 and other non-mail processing units are as much active union members in good standing as are those persons affected by the national agreement. And the article XIX classification does not serve merely to limit voting on a particular question to those with an interest in the outcome. Appellants do not claim a right to participate in ratification votes on the national agreement; they have a very substantial interest, however, in the bargaining agreement governing their own employment. Once the union acted to permit some of its members to approve or reject their contracts, section 101(a)(1) directed that similar rights be given appellants—in the absence of a reasonable rationale for discriminating. Neither the vague, broad notion of flexibility nor the formalistic adherence to outmoded interpretations of article XIX's language provides sufficient justification for denying appellants an opportunity to ratify their contract. The court below therefore erred in granting summary judgment on this question.[18] We remand for fuller consider-

---

**17.** Two additional cases rejecting claims of § 101(a)(1) violations must be mentioned. In *Allen v. International Alliance of Theatrical, Stage Employees,* 338 F.2d 309 (5th Cir. 1964), the court upheld a union constitution, which provided that members of a dissolved union became members at large in the international, and denied the appellant's request for a declaration that he, as a member at large, was entitled to the same voting rights as other members of locals. In justifying this conclusion, the court merely noted: "[w]hen the structure of the International is considered, the status of 'member at large' is not at all contradictory to the Act." *Id.* at 319. Although such summary treatment makes analysis difficult, the case seems similar to the line of decisions, discussed at text accompanying note 16 *supra,* that permit unions to classify members according to their interests.

Of similar brevity is the discussion in *Smith v. United Mine Workers,* 493 F.2d 1241 (10th Cir. 1974). There the court approved a constitutional provision that gave only self-supporting districts the right to vote on alteration of their boundaries. The court reasoned that there was no indication that the self-supporting distinction was unreasonable or applied unequally. *See id.* at 1244. It seems quite reasonable for a union to impose cost-saving mergers on districts that are not self-sustain-

ing; we see no inconsistency between the holding in *Smith* and our finding that the discrimination effected by the APWU constitution is impermissible.

**18.** The union attempts to distinguish the cases relied on by appellants on the ground that § 101(a)(1) violations were found in those cases only because the unions had blatantly infringed the voting rights guaranteed by their constitutions. *See Bunz v. Moving Picture Operators' Protective Union Local 224,* 567 F.2d 1117 (D.C.Cir.1977); *Trail v. International Bhd. of Teamsters,* 542 F.2d 961 (6th Cir. 1976); *Christopher v. Safeway Stores, Inc.,* 476 F.Supp. 950 (E.D.Tex.1979). We find this argument unpersuasive. Appellants need not prove that their rights under the APWU constitution were denied because a union may not escape the equal rights mandate of § 101(a)(1) by adopting a constitution that condones discrimination. Any constitutional provision contrary to § 101(a)(1) is void. *See* LMRDA § 101(b), 29 U.S.C. § 411(b) (1976); *see also Pignotti v. Local 3, Sheet Metal Workers' International Ass'n,* 477 F.2d 825, 831 (8th Cir.), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *Sabolsky v. Budzanoski,* 457 F.2d 1245, 1252 (3d Cir.), *cert. denied,* 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972).

ation of the local's allegations and the union's defenses.[19]

## III. THE UNION'S BARGAINING CONDUCT

### A. *Duty of Fair Representation*

Local 6885 next contends that appellees violated their statutory duty of fair representation and fiduciary duty in resuming negotiations with the USPS and agreeing to a contract. Appellants raise a number of specific objections to the union's bargaining conduct, which we address below.

■ Initially, we note generally that a union must be given a wide range of discretion in representing its members, particularly in the give-and-take process of negotiation. Individual dissatisfaction with the outcome of bargaining is to some extent unavoidable and does not necessarily indicate any breach of duty by the union. As the Supreme Court recognized in *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953):

Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is

hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

The Court then explained in *Vaca v. Sipes*, 386 U.S. 171, 177, 190, 87 S.Ct. 903, 909–916, 17 L.Ed.2d 842 (1967), that the duty of fair representation, which is implicit in a union's authority to serve as the exclusive representative of a unit, *see* NLRA § 9(a), 29 U.S.C. § 159(a) (1976), is violated only when the union's conduct toward one of its members is arbitrary, discriminatory, or in bad faith.[20]

Appellants' primary fair representation complaint is that the union had promised to consult with the local and failed to do so prior to resuming bargaining and altering its negotiating position. It is true that courts have found violations of the duty of fair representation when a union has not adequately informed its members of matters on which they must act. *See Warehouse Union Local 860 v. NLRB*, 652 F.2d 1022 at 1025–26 (D.C.Cir.1981) (duty to inform clerical unit employees that seventy percent wage increase, which they had demanded and which was included in contract on which they were to vote, would result in employer's eliminating the entire unit);

---

**19.** Appellants also argue that the discriminatory denial of the right to ratify violated the union's duty of fair representation, *see* note 20 *infra*, and the union officials' fiduciary duty, *see* note 23 *infra* & accompanying text. Courts facing similar challenges have not distinguished between § 101(a)(1) and duty of fair representation claims. *See, e.g., International Bhd. of Teamsters Local 310 v. NLRB*, 587 F.2d 1176, 1182 (D.C.Cir.1978); *Trail v. International Bhd. of Teamsters*, 542 F.2d 961, 966, 968 (6th Cir. 1976). As far as the members of Local 6885 are concerned, these claims appear to be interchangeable in this case, and their remedies duplicative. They may differ, however, in their remedial consequences for the intervening nonunion members of the unit. *See* note 5 *supra*. If the district court concludes that appellants have stated a valid claim under § 101(a)(1), the court should then determine the significance of that finding for intervenors' duty of fair representation allegations.

**20.** Appellants claim that the union's conduct was *discriminatory* only in that they were not permitted to ratify the contract. The duty of fair representation does not itself require ratification votes. *See, e.g., International Bhd. of Teamsters Local 310 v. NLRB*, 587 F.2d 1176, 1182 (D.C.Cir.1978); *Aikens v. Abel*, 373 F.Supp. 425, 432 (W.D.Pa.1974). But the discriminatory denial of the right to ratify may be inconsistent with a union's obligation. *See, e.g., International Bhd. of Teamsters Local 310*, 587 F.2d at 1182; *Trail v. International Bhd. of Teamsters*, 542 F.2d 961, 968 (6th Cir. 1976). Because we find no substantive difference between appellants' discrimination claim under § 101(a)(1) and under the duty of fair representation, *see* note 19 *supra*, we do not address the allegation that the refusal to submit the contract to Local 6885 members for ratification violated the union's duty of fair representation. The fair representation discussion will therefore involve only the questions whether the union's actions were *arbitrary* or *in bad faith*.

*Robesky v. Qantas Empire Airways Ltd.,* 573 F.2d 1082, 1091 (9th Cir. 1978) (obligation to give appellant information that was "important if not critical" to her decision whether to accept employer's offer to settle grievance); *International Union of Electrical, Radio & Machine Workers, Frigidaire Local 801 v. NLRB,* 307 F.2d 679, 683 (D.C. Cir.), *cert. denied,* 371 U.S. 936, 83 S.Ct. 307, 9 L.Ed.2d 270 (1962) (duty to "inform the employee of his rights and obligations so that the employee may take all necessary steps to protect his job"; there, obligation to tell employee that failure to join union and pay dues would result in discharge). The union's duty might also be violated if it made no effort to communicate with those affected by its conduct and acted with no input from them. *See NLRB v. American Postal Workers Union, St. Louis Local,* 618 F.2d 1249, 1255 (8th Cir. 1980).

Here, appellants do not deny that the union had consulted with them and knew their position on the issues in dispute; the record contains no suggestion or evidence that further contact between the local and its bargaining representative was necessary prior to the final negotiating session. And this is not a case in which appellants were not given information important to a choice they were to make—the local had no decision to make at that stage of the bargaining.

Moreover, there is no indication in the record that the union's action in reopening negotiations without informing or consulting the local was hostile or in bad faith. Although it may have been preferable for the union to have communicated the change of plans to appellants, we cannot say that, in the rush to reach agreement prior to the beginning of factfinding, this omission was "so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *Robesky,* 573 F.2d at 1090.

Closely related to the consultation issue is appellants' allegation that the APWU breached its duty of fair representation by conceding previously held union demands during the final round of negotiations. Compromise is what bargaining is all about, and a union does not act improperly in reversing a bargaining position. *See Waiters Union, Local 781 v. Hotel Ass'n,* 498 F.2d 998, 1000 (D.C.Cir.1974). In fact, decisions regarding bargaining strategy and the relative merits of different bargaining postures are precisely the type of judgments left to the discretion of the negotiator. *See Ford Motor Co.,* 345 U.S. at 337–38, 73 S.Ct. at 685–86. Although the duty of fair representation may require some meaningful consideration of the members' viewpoint, *see Waiters Union Local 781,* 498 F.2d at 1000, the evidence is undisputed that the bargaining representative did solicit the local's opinion here. And, as in *Waiters Union Local 781,* appellants do not suggest, and we have no reason to suspect, that the attention given appellants' demands was only perfunctory. Indeed, it appears that both parties made concessions during the final negotiations, *see* Brief for Appellees APWU, et al., at 14–15, and appellants point out no respect in which those made by the APWU were either hostile to appellants or arbitrary.

Finally, the local insists that the duty of fair representation was violated when the APWU breached its promise to suspend negotiations during the factfinding procedure, thereby depriving appellants of their statutory right to factfinding. Appellants maintain that, once ninety days of bargaining have expired without agreement and the factfinding procedures set out in PRA § 1207(b), 39 U.S.C. § 1207(b) (1976), have begun, that process may not be interrupted by the reopening of negotiations.

The legislative history demonstrates, however, that Congress intended to defer at all times to agreements between labor and management. Because postal employees are not permitted to strike, Congress provided for binding arbitration in the face of impasse at the bargaining table. *See* H.R. Rep.No.1104, 91st Cong., 2d Sess. 14, *reprinted in* [1970] U.S.Code Cong. & Ad. News 3649, 3662; *see also* PRA § 1207(d), (c), 39 U.S.C. § 1207(d), (c) (1976). But

Congress felt that "the essence of successful collective bargaining" was effort by the parties to reach agreement and not a resolution imposed by an outside arbitrator. *Id.,* [1970] U.S.Code Cong. & Ad.News at 3662. Arbitration was therefore to be resorted to only after "every reasonable possibility of reaching bilateral agreement [had] been exhausted." *Id.,* [1970] U.S.Code Cong. & Ad.News at 3663. Similarly, Congress preferred that labor and management agree to procedures for dealing with unresolved issues. The House report thus noted:

> [I]t is the intent of the Congress that the parties by agreement adopt any mutually desired procedures for the resolution of disputes or impasses arising in the negotiation of a collective bargaining agreement and not rely on the statutory procedure for resolving disputes that is prescribed in the bill.

*Id.,* [1970] U.S.Code Cong. & Ad.News at 3663. While urging the parties to develop their own means for breaking deadlocks, Congress recognized that some such procedure must be established for those cases in which the parties were unable to agree. Factfinding was designed to serve that function.

The legislative history thus clearly indicates that Congress preferred agreement by the parties to reliance on the statutory procedures. If agreement is reached after the factfinding procedures have been initiated, nothing in section 1207 suggests that the parties are required to go through a meaningless exercise and complete factfinding. In fact, it would appear more consistent with congressional intent to disband the factfinding panel and implement the agreement.

Moreover, the union's avoidance of factfinding here may not be classified as arbitrary or in bad faith and therefore inconsistent with the duty of fair representation. Both parties agree that the union was motivated by an uneasiness about factfinding, and not by personal animosity towards appellants. The APWU's chief negotiator felt that factfinding was not in the best interests of the local because it was expensive, dilatory, and often useless. We do not consider this apprehension arbitrary.

■ In sum, we find the union's conduct during bargaining consistent with its duty of fair representation. Appellants' dissatisfaction with the outcome, though unfortunate, does not by itself suggest inadequacy in the union's performance. And appellants have not exhibited an ability to offer evidence of bad faith or arbitrariness—the proof necessary to demonstrate a violation of the duty of fair representation—with respect to the failure to inform and consult the local before resuming negotiations, the concessions made at the final bargaining session, or the interruption of factfinding.[21] We therefore affirm the district court's dismissal of these duty of fair representation claims.

## B. *Fiduciary Duty*

Relying on the same factual allegations made with respect to the duty of fair representation issue, appellants argue that the union official's conduct during the bargaining process violated their fiduciary duty under LMRDA § 501, 29 U.S.C. § 501 (1976).[22] The circuits have disagreed

---

21. We likewise reject appellants' claims that the union breached its duty in other ways. The refusal to permit local members to attend the final bargaining session was not motivated by hostility to appellants and was not arbitrary, given the USPS's insistence that only the chief negotiators meet. And we find appellants' allegation that the APWU was dilatory in giving them a copy of the final contract frivolous.

22. Section 501 provides in pertinent part:
 The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter

whether section 501 suits are available only to redress fiduciary violations concerning misuse of union funds or property. Most courts have read section 501 broadly and have interpreted it as establishing the fiduciary obligations of union officials in all their functions. *See, e.g., Stelling v. International Bhd. of Electrical Workers Local 1547*, 587 F.2d 1379, 1385–87 (9th Cir. 1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979); *Johnson v. Nelson*, 325 F.2d 646, 649–51 (8th Cir. 1963); *Pignotti v. Local 3, Sheet Metal Workers International Ass'n*, 343 F.Supp. 236, 243 (D.Neb.1972), *aff'd*, 477 F.2d 825 (8th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973). *But see, e.g., Gurton v. Arons*, 339 F.2d 371, 375 (2d Cir. 1964). This circuit has twice declined to construe section 501, *see Yablonski v. United Mine Workers*, 466 F.2d 424, 428 n.5 (D.C.Cir.1972), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973); *Cefalo v. Moffett*, 449 F.2d 1193, 1198 & n.15 (D.C.Cir.1971), although we did hint in *Cefalo* that we had impliedly approved the majority view, *see id.* at 1198 n.15.

Even if appellants are correct that section 501 prohibits more than misuse of union money and property, it may not reach the conduct complained of here. *See Carr v. Learner*, 547 F.2d 135, 137–38 (1st Cir. 1976); *Aikens v. Abel*, 373 F.Supp. 425, 433 (W.D.Pa.1974). Those courts held that section 501, unlike the duty of fair representation, was meant to apply primarily to internal union affairs and not to a union official's performance during collective bargaining. In support of this reading, the First Circuit pointed to the other avenues of relief available to those challenging a union's bargaining conduct. *See Carr*, 547 F.2d at 138.

We see no need to reach either question regarding section 501's scope. Even if appellants have stated a cause of action under that provision, they are able to allege no facts supporting a claim of breach of fiduciary duty. The bases of the violation they assert are precisely those rejected above in part III(A). For the same reasons, we find nothing reprehensible in appellee's bargaining performance here.[23]

## IV. DISMISSAL OF THE POSTAL SERVICE DEFENDANTS

Appellants challenge the order of the court below dismissing all claims against the USPS and its chief negotiator, Edward Ward, *see* J.A. at 107. The local alleges that these appellees participated in the union's breach of the duty of fair representation and fiduciary duty by entering into a covert agreement with the APWU and by concealing the final round of negotiations from appellants.[24] Because we have found no merit in appellants' contention that the APWU conduct which the USPS allegedly assisted was inconsistent with those duties, the claims against the Postal Service must also fall.

Even if appellants could point to some wrongdoing on the union's part, the court below properly found that the duty of fair representation and fiduciary duty impose no obligations on the employer. *See,*

---

connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.

29 U.S.C. § 501(a) (1976). This provision imposes a duty only on representatives of the union, and not on the organization itself. *See, e.g., Pignotti v. Local 3, Sheet Metal Workers' International Ass'n*, 477 F.2d 825, 832 (8th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *Sabolsky v. Budzanoski*, 457 F.2d 1245, 1249 (3d Cir.), *cert. denied*, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972). Only Andrews and Wevodau are therefore named in this court.

**23.** Again, for the reason discussed in note 20 *supra*, we do not decide whether the union officials may have breached their fiduciary duty by refusing to permit appellants to ratify their contract.

**24.** Apparently appellants also contend—although with much less emphasis—that the Postal Service was implicated in the discrimination against the local effected by the union's constitution. *See* note 26 *infra*.

*e.g., Baker v. Newspaper & Graphic Communications Union, Local 6,* 628 F.2d 156, 160 (D.C.Cir.1980); *Coleman v. Kroger Co.,* 399 F.Supp. 724, 731–32 (W.D.Va.1975); *Pignotti v. Local 3, Sheet Metal Workers International Ass'n,* 343 F.Supp. 236, 242 (D.Neb.1972), *aff'd,* 477 F.2d 825 (8th Cir.), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *Glus v. G. C. Murphy Co.,* 329 F.Supp. 563, 567–68 (W.D.Pa.1971). The Postal Service was required only to bargain in good faith with the employees' exclusive representative, and, in so doing, it was expected to represent its own interests, not those of the employees. It had no duty, for example, to inform the local of the resumption of collective bargaining.

Appellants correctly point out that an employer may sometimes be joined in a suit involving duty of fair representation claims against a union. In all such cases, however, the employer somehow acted improperly and infringed the rights of the individual aggrieved employees. If the employer violates the collective bargaining agreement, for example, jurisdiction lies under LMRA § 301(a), 29 U.S.C. § 185(a) (1976).[25] *See Vaca v. Sipes,* 386 U.S. 171, 183–87, 195–98, 87 S.Ct. 903, 913–15, 919–21, 17 L.Ed.2d 842 (1967); *Adams v. Budd Co.,* 349 F.2d 368, 369–70 (3d Cir. 1965); *Coleman,* 399 F.Supp. at 727; *Glus,* 329 F.Supp. at 568. In this case, appellants do not allege that the Postal Service has *violated* a contract; in fact, they complain that the USPS has *adhered* to a contract with which they are dissatisfied.

■ Similarly, an employer that knowingly acquiesces to union pressure and takes discriminatory action against an employee may be joined as a defendant. *See, e.g., Czosek v. O'Mara,* 397 U.S. 25, 29, 90 S.Ct.

770, 773, 25 L.Ed.2d 21 (1970); *NLRB v. American Postal Workers Union, St. Louis Local,* 618 F.2d 1249, 1258–59 (8th Cir. 1980); *Fruin-Colnon Corp. v. NLRB,* 571 F.2d 1017, 1021 (8th Cir. 1978); *Lummus Co. v. NLRB,* 339 F.2d 728, 737 (D.C.Cir. 1964). In each of these cases, the court required that the employer have actual notice of, or might reasonably be charged with notice of, the union's breach of duty to its members. The employer was then liable for retaliatory action taken against the plaintiff-employees in violation of their rights under the collective bargaining agreement or their organizational rights under NLRA section 8(a)(1) and (3), 29 U.S.C. § 158(a)(1), (3) (1976).

■ None of these cases aid appellants' cause. The Postal Service's conduct during the negotiating process was not inconsistent with the provisions of a collective bargaining agreement or with its statutory responsibilities. It took no impermissible action against appellants for which compensatory or injunctive relief would be appropriate. In such a case, an employer is not liable for a union's breach of duty.[26]

Appellants maintain, however, that because they seek rescission of the contract, they may join the Postal Service defendants under Federal Rule of Civil Procedure 19(a), relating to indispensable parties. An employer may well be an indispensable party to a suit properly seeking revocation of a collective bargaining agreement between that employer and a union. *See Ward v. Deavers,* 203 F.2d 72, 75 (D.C.Cir.1953); *Johnson v. Colts, Inc.,* 306 F.Supp. 1076, 1079–80 (D.Conn.1969); *Morris v. Steele,* 253 F.Supp. 769 (D.Mass.1966); *see generally* 7 C. Wright & A. Miller, Federal Practice

---

**25.** See note 8 *supra.*

**26.** Like the duty of fair representation and fiduciary duty, LMRDA § 101(a)(1) imposes no obligation on employers and creates no cause of action against them. *See Hayes v. Consolidated Service Corp.,* 517 F.2d 564, 566 (1st Cir. 1975); *Christopher v. Safeway Stores, Inc.,* 476 F.Supp. 950, 952 (E.D.Tex.1979); *Pignotti v. Local 3, Sheet Metal Workers International Ass'n,* 343 F.Supp. 236, 242 (D.Neb.1972), *aff'd,* 477 F.2d 825 (8th Cir.), *cert. denied,* 414 U.S.

1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973). For the reasons discussed in text, our reversal of the district court's dismissal of appellants' § 101(a)(1) claim does not affect our approval of the dismissal of the Postal Service defendants. Appellants have alleged no respect in which the USPS assisted the union's alleged discrimination by taking action against them in violation of their contractual or statutory rights.

& Procedure §§ 1613, 1620 (1972). But that remedy is not available to Local 6885 here.[27] The courts are generally reluctant to disturb the results of bargaining and have apparently voided only those contract provisions that are on their face arbitrary or discriminatory. *See, e.g., Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (contract imposed restrictions on employment of black firemen). In such cases, the employer may be said to have been implicated in the union's breach of duty to its members. No provision in the contract involved here is alleged to be analogous. The district court's dismissal of the claims against the Postal Service appellees must therefore be affirmed.[28]

## V. CONCLUSION

We find the district court's order of judgment for the APWU premature on the question of ratification: appellants have raised a genuine issue regarding the permissibility under section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1) (1976), of limiting the right to ratify to employees covered by the national agreement. That challenge may not be disposed of by simple reference to the desirability of flexibility. It requires further consideration of the local's charges and the union's defenses.

Because we find that section 101(a)(1) may provide a remedy for the discriminatory denial of ratification rights, we need not decide whether that claim may also be pursued under the duty of fair representation

and fiduciary duty counts of the complaint. With respect to appellants' allegations that other aspects of the union's conduct during bargaining violated these duties, we approve the district court's grant of summary judgment for appellees.

Finally, we affirm the dismissal of the Postal Service appellees. In the absence of some indication that an employer acted impermissibly against union members—for example, by violating its contractual or statutory responsibilities or by agreeing to a contract provision that was facially arbitrary or discriminatory—it may not be charged with a union's breach of duty of fair representation or fiduciary duty.

*Reversed and remanded.*

NICHOLS, Judge, concurring and dissenting:

I agree with and join in the holding that the APWU breached the provisions of section 101(a)(1) of the Labor-Management Reporting and Disclosure Act of 1959 by its failure to allow Local 6885 to vote on ratification of the contract the national union had negotiated on the local's behalf, and by putting the contract in effect without ratification. At least, I thought that was the holding until I had read the last sentence of Part II and the footnote thereon, n. 19. My idea until then was that summary judgment for appellant must ensue. That does not appear technically possible for us to

---

**27.** Should appellants prove that the APWU did impermissibly deprive them of the opportunity to ratify their contract, they would be entitled to any appropriate compensatory, injunctive, and declaratory relief against the union. *See, e.g., Alvey v. General Elec. Co.*, 622 F.2d 1279, 1287 (7th Cir. 1980); *Christopher v. Safeway Stores, Inc.*, 476 F.Supp. 950, 955 (E.D.Tex. 1979).

**28.** Appellants additionally maintain that the doctrine of pendent jurisdiction permits them to join the Postal Service defendants. The Supreme Court has left open the possibility that in some cases the federal courts may exercise pendent jurisdiction over parties against whom there are no federal claims and therefore over whom the courts have no independent basis for

jurisdiction. *See Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). Even if such pendent party jurisdiction is available in cases like this, it does not confer jurisdiction over defendants, such as the Postal Service, against whom a plaintiff has no claim at all.

Intervenors also challenge the district court's order granting their motion to intervene, which provided that the order would not interfere with dismissal of the USPS. Pointing out that their complaint alleged a breach of contract by the Postal Service, intervenors argue that this proviso was error. They do not contest, however, the district court's holding that their complaint was untimely as to the Postal Service, *see* Brief for Intervenors app. at B–14, and we discern no abuse of discretion in that finding.

achieve, as no motion for such judgment was before the trial court, but I still have the overwhelming conviction that there is no issue to try on the remand except the quantum of recovery.

If this conclusion does not follow from the impact of § 101(a)(1) on the case, then it does from Article XIX of the Union Constitution: that the authority of the National Negotiating Team is subject to

2. Approval by a majority of the union members voting who are covered by the proposed agreement.

This seems to contemplate expressly that it applies to agreements covering less than all the members since the majority must be of members "who are covered." This language is free from ambiguity and requires no elucidation by context or "legislative history." The significance of the brochure quoted in n. 6 is that it is obviously intended to state a fundamental law of the union, not just to make a promise. Let me quote a little more than n. 6 does:

The APWU is a democratic union with a voice and vote for every member, not only in the election of officers, but the APWU *will not validate* any contract it negotiates without *submitting it to you* . . . . The APWU is a Union that knows of no race, creed, or color. (Emphasis in original.)

Obviously when they joined the parent union, Rockville employees would reasonably have thought the commitment applied to them. The national leadership may have thought or intended otherwise, but in a contract of adhesion, such as this, it is what the adhering party reasonably believes that must control.

The plaintiffs originally sought injunctive relief. Since their right to ratification is now express, it would appear that their requests for a declaratory judgment that the July 1, 1978, agreement is null and void, and for money damages, are the remaining active questions on remand. Can the declaratory judgment be denied? Perhaps our decision under Part IV requires that conclu-

sion. As regards the money damages, the plaintiffs seem to contend that they would have been better off in a pecuniary way if no agreement had been negotiated, in view of the normal Civil Service and Post Office regulations that would have applied. They say they lost some "merit increases" and "saved grade" positions. The technicalities of these issues have not been explained to us and of course I do not undertake to pass on them. At any rate, under Part II of the opinion I do not see how monetary relief can be denied to any plaintiff who can show an actual money loss of the kind stated.

It appears to me that the union officials who negotiated the contract placed themselves in a conflict of interests position by simultaneously negotiating with the same management some contracts that required ratification, and some that by their view did not. They would be under a strong temptation to make the inevitable concessions to management in the contracts not to be ratified, and obtain the plums in those that were to be. Any court sitting in equity, as the trial court was here, should not overlook these things. I would not exonerate any union official from breach of the duty of fair representation who voluntarily put himself in such a position unless he had shown by clear and convincing evidence that he had inflicted no harm. So the point is more relevant to what we say, perhaps, than to what we do.

I agree with and join in Part IV, which affirms dismissal of the Postal Service defendants.